**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JILL MALL,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:17-CV-02257-JAR-JPO** |
| **BNSF RAILWAY COMPANY,** | |
| **Defendant.** | |

## MEMORANDUM & ORDER

Plaintiff Jill Mall brings this action against her former employer, Defendant BNSF Railway Company ("BNSF"). Plaintiff alleges that BNSF's termination of her employment violated the American with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act ("Title VII"), and Kansas state law. This matter is before the Court on BNSF's Motion for Summary Judgment (Doc. 40) on all of Plaintiff's claims. For the reasons discussed in detail below, the Court **grants** BNSF's motion as to all claims.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.    Uncontroverted Facts

The following material facts are uncontroverted, stipulated to in the Pretrial Order,[16] stipulated to for purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

Under D. Kan. Rule 56.1(b), a memorandum opposing a motion for summary judgment must contain "a concise statement of material facts as to which the party contends a genuine issue exists."  Importantly, D. Kan. Rule 56.1(b) requires that each fact in dispute "refer with particularity to those portions of the record upon which the opposing party relies."  Throughout

---

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[16]Doc. 37.  The Court encourages the parties to review the "Administrative Procedure for Filing, Signing and Verifying Pleadings and Papers by Electronic Means in the United States District Court for the District of Kansas" for the proper filing protocol for voluminous exhibits such as the ones attached to these briefs.  The relevant procedures can be found in Section IV. Attachments.

her Response, Plaintiff fails to consistently adhere to the standard provided for by D. Kan. Rule 56.1(b). Accordingly, the Court deems facts not adhering to the particularity requirement as uncontroverted.

**Plaintiff's Employment at BNSF**

Plaintiff began her employment with BNSF in September 2014 as an Employee Assistance Manager I ("EAM I") based in Kansas City, Kansas. In January 2017, BNSF terminated Plaintiff's employment.

BNSF is an interstate Class I freight railroad and employs more than 40,000 employees. As an EAM I, Plaintiff was part of BNSF's Employee Assistance Program ("EAP") and managed a caseload for BNSF employees who had various life challenges, such as substance abuse, depression, domestic problems, and exposure to traumatic events, and she also provided training and gave presentations to others at BNSF on addressing such issues. The EAM I position required travel about one-third of the year, and managers occasionally rotated to be on-call on a twenty-four hours per day/seven days per week basis. Plaintiff was one of eleven EAP managers across the BNSF system, and was responsible for a multi-state region covering Kansas, Missouri, and parts of Oklahoma and Texas.

At the beginning of her employment with BNSF, Plaintiff reported to Rose Whitcomb, a regional manager or EAM II, based in Springfield, Missouri. An EAM II provides EAP services for and supervises the EAM I managers in her region, and oversees the delivery of EAP services in the region.

**Plaintiff's LAM**

In 2006, Plaintiff was diagnosed with a chronic lung disease called lymphangioleiomyomatosis ("LAM") that causes chest pain, difficulty breathing, shortness of

breath, exhaustion, and coughing attacks. Plaintiff's LAM symptoms also manifest in her "getting too tired" and "doing too much."[17] During the BNSF hiring and application process, Plaintiff disclosed to BNSF on a written medical questionnaire that she suffered from LAM, had no restrictions related to it, and described that she rarely experienced shortness of breath or chest pain when breathing.[18] Whitcomb, Plaintiff's future supervisor, and Whitcomb's supervisor, EAP Director Amy Pool, interviewed Plaintiff for her position. During a lunch on June 23, 2015, Plaintiff and Pool discussed, among other things, that when she was first diagnosed with LAM eleven years earlier, Plaintiff had a diagnosis of one year to live.

BNSF had policies prohibiting discrimination on the basis disability. During her employment with BNSF, Plaintiff knew what actions she could take if she believed she had been improperly treated based on a disability.

### *Plaintiff's New Employee Orientation*

In June 2015, after Plaintiff had been employed by BNSF for almost nine months, she was scheduled to attend a multi-day New Employee Orientation ("NEO") session in Fort Worth, Texas, the location of BNSF's corporate headquarters. Plaintiff flew to Texas on June 21, the evening before the orientation began. When the plane landed, Plaintiff was having difficulty breathing, but she rented a car, drove herself to a hotel, and did not seek medical attention.

On June 22, the following morning, Plaintiff arrived late to the first day of orientation because she was still having trouble breathing. Plaintiff left voicemails and then emailed Whitcomb to inform her that she was having trouble breathing and running late; Plaintiff then emailed Whitcomb "I'm late for Orientation. Don't know who to contact. Don't want anyone

---

[17]Doc. 40-1, Ex. A Mall Depo. at 18:14–15.

[18]Doc. 40-1, Ex. A Mall Depo. Ex. 4.

worried."[19]  Whitcomb later responded to Plaintiff, copying Whitcomb's supervisor, stating that Plaintiff was "on the radar for concern" because she had shown up late to the orientation, was not focused, and had left the session to take calls.[20]  Plaintiff replied, apologizing if she had caused any problems and explaining that she was late because she did not feel well and had left a session to take a call involving an employee with suicidal ideation.[21]  Whitcomb replied, explaining that it was "not a problem," and adding that "certain folks jump up on complaining about anyone who is not riveted by the presentation."[22]  Whitcomb advised that Plaintiff needed to use her time at NEO "to learn about the company and not feel torn by Division needs," and that she was not the first EAM to be in her situation.[23]

That evening, Plaintiff spoke with Pool and Whitcomb, and Pool told Plaintiff she would have to repeat the entire NEO training if she left early.  Plaintiff also sent Whitcomb and Pool a follow-up email, describing the first day's events and how her breathing difficulties caused her delayed arrival, and thanking them for their support and advice on how to best represent her team.[24]  Whitcomb replied the next morning, stating that Plaintiff had set out a "[g]ood plan" and apologizing if she had not clarified the importance of the NEO.[25]

***Plaintiff's 2015 Mid-year Performance Evaluation and Performance Action Plan***

On July 14, 2015, Plaintiff and Whitcomb discussed work-related matters, including her cases, case staffing, and training issues.  Following the meeting, Plaintiff made notes of their

---

[19]Doc. 40-1 Ex. A Mall Depo. at 50:4–51:22; Mall Depo. Ex. 6.

[20]Doc. 40-1 Ex. A Mall Depo. at 54:5–25; Mall Depo. Ex. 7.

[21]Doc. 40-1 Ex. A Mall Depo. at 56:10–17; Mall Depo. Depo. Ex. 7.

[22]Doc. 40-1 Ex. A Mall Depo. at 57:1–12; Mall Depo. Ex. 7.

[23]*Id.*

[24]Doc. 40-1 Ex. A Mall Depo. at 59:5–60:8; Mall Depo. Ex. 8.

[25]Doc. 40-1 Ex. A Mall Depo. at 60:9–17, Mall Depo. Ex. 8.

discussion. Plaintiff recalls that during the meeting, Whitcomb referenced Plaintiff leaving work early due to a migraine, but does not recall discussing her LAM or related issues. Plaintiff explained how she was overwhelmed because she had difficulties accessing "2x," a computer database, and had nine months' work of "back data" that needed to be entered. Whitcomb also instructed Plaintiff to utilize the Outlook program to document her whereabouts each hour of the day.

On July 20, 2015, Whitcomb gave Plaintiff a mid-year performance review. BNSF employees are evaluated on a series of individual objectives, and receive "exceeds target," "on target," or "needs improvement" ratings from their supervisor on each objective, as well as an overall rating. In her 2015 mid-year evaluation, Whitcomb rated Plaintiff as "on target" in all but one of the objectives and gave her an overall performance rating of "on target." Plaintiff originally received an overall rating of "needs improvement" on her evaluation, but the rating increased after she "escalated . . . concerns" to a BNSF director.[26]

Whitcomb testified that in July 2015 she also prepared a Performance Action Plan ("PAP") for Plaintiff, setting out some areas for improvement, including professionalism, case management, and process.[27] According to Whitcomb, the PAP was not a formal BNSF process, but was a document she created "to target areas where there was room for growth and need for change as far as following processes and moving forward in the division."[28] In the PAP, Whitcomb wrote that it was "a tool for performance improvement and addresses areas in need of attention," but "does not reduce or negate the many positive qualities and strengths [Plaintiff]

---

[26]Doc. 40-1 Ex. A Mall Depo. at 82:12–83:22, 85:6–86:7.

[27]Doc. 40-1 Ex. A Mall Depo. Ex. 10.

[28]Doc. 40-2, Ex. B Rose Whitcomb Depo. at 40:18–25.

brings to the EAP team, the Kansas division and [the] BNSF system."[29]  She also wrote that "[t]he level of respect and positive regard [Plaintiff] has with her teammates and Division has been expressed by peers and leadership and this is certainly appreciated."[30]  Plaintiff does not recall receiving the PAP, and the PAP lacks both Plaintiff's signature and a signature line for Plaintiff.[31]  Whitcomb, however, recalls that Plaintiff believed that the PAP was a Performance Improvement Plan ("PIP"), which is a more formal human resources process issued when an employee receives an overall "needs improvement" rating on a performance evaluation.

In September 2015, Whitcomb issued Plaintiff an updated PAP, noting that Plaintiff "continues to grow into the role of Kansas Division EAM and she has made a concentrated effort to improve in the areas where additional attention is needed."[32]  She additionally noted that BNSF was adding Sharon Johnson, another EAM, as a "buddy/mentor" for Plaintiff.[33]  Pool described a mentor as "another tool in the . . . training and support toolbox."[34]  BNSF selected Johnson as Plaintiff's buddy/mentor because Johnson had "some skill as far as working through some challenges as far as getting the hang of" aspects of the EAM I job and had "demonstrated that she could do really well."[35]  Although the other EAP managers had a "buddy," Plaintiff was the only EAP manager to have a "buddy/mentor."

On September 28, 2015, Plaintiff contacted Jean Artzer, a BNSF human resources manager, to discuss concerns about her employment.  Among other things, Plaintiff complained

---

[29]Doc. 40-1, Ex. A Jill Mall Depo. at 93:2–22; Mall Depo. Ex. 10.

[30]*Id.*

[31]*Id.*

[32]Doc. 40-1, Ex. A Jill Mall Depo. at 100:13–23; Mall Depo. Ex. 12.

[33]Doc. 40-1, Ex. A Jill Mall Depo. at 96:24–97:18; Mall Depo. Ex. 12.

[34]Doc. 40-3, Ex. C Pool Depo. at 41:3–42:12.

[35]Doc. 40-2, Ex. B Rose Whitcomb Depo. at 74:7–75:2.

about Whitcomb and Pool; she told Artzer she received several "needs improvement" ratings on her mid-year evaluation, that she had a difficult time reaching Whitcomb, and that she had not been properly trained. Plaintiff also discussed her breathing difficulties, which had caused her to be late to the first day of NEO, and the incident where she missed work due to a migraine. Artzer advised Plaintiff to ask her supervisors for specific feedback and direction, to listen carefully to the feedback and comply with the direction.[36]

### The 2015 EAPA Conference and Plaintiff's First Short-Term Disability Leave

In late-September 2015, Plaintiff was scheduled to attend the Employee Assistance Professional Association ("EAPA") conference in San Diego and to present information during a team meeting. Plaintiff did not feel well, however, and was receiving breathing treatments. Her physician recommended she not fly during this time. As a result, and after advising Pool and Whitcomb of her breathing treatment and physician's advice, Plaintiff did not attend the EAPA conference. A member of Plaintiff's management team indicated that she could present during the team meeting via teleconference. Plaintiff was coughing during the meeting, and prior to her presentation, Whitcomb and Pool told Plaintiff not to go forward with her portion of the meeting because her cough "was scaring [her] teammates."[37] Pool recalls that Plaintiff was speaking "slowly," and that some of her co-workers expressed concern about Plaintiff because she did not "sound like herself."[38] Whitcomb recalls Plaintiff sounding "like she had a cold or sore throat," and that they told her not to worry about giving the presentation if she did not feel well.[39] Shortly after the EAPA meeting, in October 2015, Plaintiff took short-term disability leave

---

[36]Doc. 40-1, Ex. A Jill Mall Depo. at 114:8–115:18; Mall Depo. Ex. 13.

[37]Doc. 40-1, Ex. A Jill Mall Depo. at 131:8–22.

[38]Doc. 40-3, Ex. C Amy Pool Depo. at 38:11–39:2.

[39]Doc. 40-2, Ex. B Rose Whitcomb Depo. at 67:6–23.

pursuant to the FMLA due to her lung impairment.

*Plaintiff's Return to Work in 2016*

Plaintiff returned to work in January 2016 and was approved to take intermittent FMLA leave to attend doctors' appointments. At that time, Plaintiff did not request any accommodations and does not recall having any other restrictions. In January 2016, Plaintiff received her 2015 year-end performance evaluation, which included an overall rating of "on target."[40] Plaintiff had also received an overall rating of "on target" for her 2014 year-end review. She also earned a year-end bonus and a compensation increase "[a]t some point."[41]

BNSF considered placing Plaintiff on a formal PIP when she returned to work in 2016, but instead assigned her a new supervisor. During the first quarter of 2016, Plaintiff requested that Pool assign Barb Shannon as her new supervisor, and Pool granted the request. Plaintiff requested a supervisor change because of communication issues with Whitcomb, the comments she attributed to Whitcomb, and Whitcomb's close relationship with two of Plaintiff's team members in Kansas City, which Plaintiff contends "interfered with them working with [plaintiff] cooperatively."[42] Plaintiff's team members Ben Gillam and Amber Mathias avoided communicating with her, and once held a team meeting not attended by Plaintiff where they generated assignments for Plaintiff.

On or about March 31, 2016, during a regularly scheduled phone meeting with Plaintiff to discuss work-related manners, Shannon gave Plaintiff positive feedback, and told Plaintiff "things are going better . . . just keep your health in check and things will be okay."[43]

---

[40]Doc. 40-1, Ex. A Jill Mall Depo. at 138:21–139:9; Mall Depo. Ex. 14.

[41]Doc. 40-1, Ex. A Jill Mall Depo. at 142:10–19.

[42]Doc. 40-1, Ex. A Jill Mall Depo. at 143:7–144:10.

[43]Doc. 40-1, Ex. A Jill Mall Depo. at 157:5–159:15.

***Plaintiff's Issues with Smoke Exposure***

In April and May 2016, Plaintiff attended a multi-day series of BNSF meetings at the Argosy Casino. On April 26, 2016, Plaintiff became bothered by the smell of smoke in the conference room during one of the meetings. She emailed BNSF Director of Administration Jill Rasmussen the same day, notifying her that she had to leave the meeting due to the "overwhelming" smoke at the Argosy and would not attend the meeting scheduled at the Argosy for the following day because she was "still coughing and [could not] be in that environment again . . . ."[44] She also informed Shannon of this occurrence. On May 5, 2016, Plaintiff contacted Shannon, reporting that she was ill and needed to stay home due to a worsening cough. Shannon encouraged Plaintiff to report her problem with the smoke to BNSF's injury hotline.[45] Plaintiff called the injury hotline, but the hotline could not address issues at a third-party's location.[46]

***The June 2016 Amarillo Incident***

In late-June 2016, a collision involving BNSF trains occurred near Amarillo, Texas, resulting in multiple employee fatalities and injuries. As Amarillo was part of her territory, Plaintiff received instructions to travel there to provide on-site support, recovery assistance, and crisis intervention. Plaintiff believes she left for Amarillo on June 28, and booked a return flight for either two or three days after she arrived. On June 29, the BNSF team members had a conference call with BNSF leadership, including Pool, Whitcomb, and Shannon, for an update and debriefing. Plaintiff cried during the call because she knew two of the employees who had died in the collision. Pool testified that she was concerned about Plaintiff's response to the

---

[44]Doc. 40-1, Ex. A Jill Mall Depo. Ex. 15.

[45]*Id.*

[46]Doc. 40-1, Ex. A Jill Mall Depo. at 163:1–164:15; Mall Depo. Ex. 15.

situation "because her initial reactions seemed to be one more of someone who was . . . involved in . . . the event there as opposed to a first-responder-type approach or outlook."[47]

Later that evening, Plaintiff had a call with Shannon and Pool, neither of whom were in Amarillo, during which she became upset and raised her voice to the managers. Plaintiff was upset because, among other things, she was accused of planning to leave early when she had not actually made such plans. The three discussed Plaintiff's travel situation because other employees had informed Shannon and Pool that they believed Plaintiff intended to leave Amarillo before receiving approval. Pool does not recall seeing Plaintiff's flight itinerary to and from Amarillo.[48] Pool had also learned that co-workers in Amarillo thought Plaintiff seemed "impaired," which led her to be concerned about Plaintiff's well-being and the team's ability to care for employees affected by the situation.[49] During the call, the parties agreed that Shannon was to go to Amarillo on Friday, July 1, and that Plaintiff could then return to Kansas City.

Following the call with Shannon and Plaintiff, Pool sent Plaintiff an email setting out expectations for Plaintiff, including that she stay in Amarillo for the remainder of the week and leave Saturday morning, "remain customer focused at all times," demonstrate professionalism with "[n]o drama, and not complain to anyone at work besides her supervisor about "personal stress or needs," "maintain a high level of professional boundaries in order to maintain [her] helping role," and keep organized notes to pass off to Shannon.[50] Additionally, the email

---

[47]Doc. 40-3, Ex. C Amy Pool Depo. at 69:1–16.

[48]*Id.* at 52:11–18.

[49]*Id.* at 70:9–71:1, 75:7–77:7.

[50]Doc. 40-1, Ex. A Mall Depo. Ex. 17.

instructed Plaintiff to contact Shannon if she became unable to perform her job duties and that BNSF would "assist [her] and make arrangements."[51]

After receiving the email, Plaintiff called Shannon to voice her frustration with the email and the surrounding situation, including the earlier phone call. Plaintiff was upset, and acknowledged that her voice "may have been raised a little bit" during the call.[52] Shannon was short with Plaintiff during the call and hung up on her. Early the next morning, June 30, Pool emailed Plaintiff again, stating that based on the call between Plaintiff and Shannon, Pool and Shannon were "concerned about [Plaintiff's well-being] and ha[d] lost confidence in [Plaintiff's] ability to perform [her] duties during [the Amarillo event]."[53] Pool further directed Plaintiff "to relay any critical outstanding work to [Shannon] and then stand down from all BNSF EAP duties until further notice," and to make arrangements to return home the following morning.[54] Plaintiff believes she returned to Kansas City the evening of June 30 and worked on Friday, July 1. Plaintiff testified that she spoke with her general manager about her early return to Kansas City from Amarillo, that he was positive and thankful for what she had done in Amarillo, and that he ultimately told her she needed to go home to be with her family because there was nothing else that could be done in Amarillo.[55]

During this time, Plaintiff texted her babysitter daily.[56] On June 28, 2016, Plaintiff asked the babysitter to stay the night of June 28 and maybe the next.[57] On June 29, Plaintiff informed

---

[51]*Id.*

[52]Doc. 40-1, Ex. A Jill Mall Depo. at 190:9–16.

[53]Doc. 40-1, Ex. A Jill Mall Depo. Ex. 17.

[54]*Id.*

[55]Doc. 40-1, Ex. A Jill Mall Depo. at 200:6–202:20.

[56]Doc. 47-5, Ex. F.

[57]*Id.*

the babysitter she was not able to come home that night.[58]  When responding to the babysitter's

question as to whether she needed to stay the night of June 30, Plaintiff responded that she was

"trying to leave," and then that she was coming home late that evening.[59]

***Plaintiff's Second Short-Term Disability Leave and Elimination of the EAM I Position in***

***Kansas City***

On June 30, 2016, Plaintiff arranged to go on short-term disability leave beginning on

July 6.  On July 5, the first work-day after the July 4 holiday, Plaintiff emailed Shannon and

requested a sick day, stating she was contacting BNSF's disability benefits administrator to go

on leave.  Plaintiff sought medical leave for "extreme stress and exacerbation of [her] overall

health," but the leave was not related to her LAM.[60]  Although she was aware Plaintiff took

medical leave in July 2016, Pool did not discuss the reasons for this leave with Plaintiff.

Whitcomb provided "Temporary Division Coverage" for the Kansas Division while Plaintiff was

out on leave.  From July 7, 2016 to September 8, 2016, Plaintiff received mental health

counseling related to various topics, including work-related issues and how her supervisors

treated her.

On September 16, 2016, Plaintiff called Dane Freshour, who worked in BNSF human

resources.  She discussed the events in Amarillo, voiced complaints about Whitcomb, Pool, and

Shannon, and reported that she had been locked out of her office.  Plaintiff documented

Freshour's remarks as "doesn't sound good" and "afraid they are going to meet you with

---

[58]*Id.*

[59]*Id.*

[60]Doc. 40-1, Ex. A Jill Mall Depo. at 199:3–23.

separation upon return."[61]  Freshour also recommended that Plaintiff contact another human resources representative, Kim Cummings, but Plaintiff does not recall doing so.

Pool testified that she addressed and documented employee work performance deficiencies as they occurred, and then pulled notes together to create a timeline.[62]  BNSF produced a document entitled "timeline," dated September 12, 2016, which is a chronology of notes about various alleged events involving Plaintiff dating back to her hire date.[63]  On September 13, 2016, Pool contributed to a document entitled "Panhandle Event Timeline."[64]  Metadata indicates that the "Panhandle Event Timeline" was created in one minute on September 13, 2016.[65]  In her deposition, Pool initially testified that she authored the timeline at or near of the time of the Amarillo events, but upon reviewing the metadata agreed that the timeline was compiled on September 13, 2016.[66]  Pool also explained in her deposition that the "Panhandle Event Timeline" was the result of notes that had been compiled, modified, and edited for accuracy overtime by more than one contributor and that "maybe at some point, it was saved as a document around the date" identified by the metadata.[67]

On September 23, 2016, Rebecca Stanosheck, a BNSF human resources director, wrote a letter to Plaintiff informing her that, pursuant to BNSF's Short-Term Disability Summary Plan Description, if she had not been released to work after twelve weeks of leave, BNSF had the

---

[61]Doc 47-4, Ex. E.

[62]Doc. 40-3, Ex. C Amy Pool Depo. at 55:2–21.

[63]Doc. 51, Ex. D BNSF-MALL 001161–001162

[64]Doc. 47-1, Ex. B at 53:6–22; Ex. B Depo. Ex. 28.

[65]Doc. 47-1 Ex. B Depo. Ex. 28.

[66]Doc. 47-1 Ex. B at 53:14–59–24; Ex. B Depo. Ex. 28.

[67]Doc. 47-1 Ex. B at 58:10–59:24.

right to fill her position.[68]  The letter further stated that Plaintiff's disability had extended past the twelve weeks, and that based on departmental needs, BNSF had decided to eliminate the EAM I position in Kansas City, and post and fill an EAM I position in Billings, Montana.[69] Although she intended to mail this letter on September 23, BNSF employee Marcie Martinez missed the last outgoing mail pickup and sent the letter the morning of September 26, 2016. Stanosheck, Pool, Martinez, and Dr. Ken Knight, a BNSF medical director, discussed sending Plaintiff this letter in an email chain that began on September 23, 2016 and had the subject "fill position at 12 wk notif."[70]

During the latter half of 2016, BNSF underwent a significant reorganization that included numerous employee layoffs and elimination of the Springfield division.  Plaintiff does not know who decided to eliminate the Kansas City EAM I position or create the Billings position. However, various BNSF individuals, including Pool, Stanosheck, Dr. Ken Knight and Dr. Michael Jarrard, BNSF's assistant vice president over the medical department, decided to move the EAM I position from Kansas City to Billings.  BNSF decided this for multiple reasons, including the business needs arising from Montana being the only BNSF division that did not have an EAP manager "on the ground" locally, and because of a "utilization need" in the area due to increased alcohol use in the area and the safety issues this created.[71]  While Pool could not "pinpoint" the exact date when the decision to add an EAP Manager I position in Montana occurred, she stated that the position had been discussed "pretty regularly since early 2016."[72]

---

[68]Doc. 40-1, Ex. A Jill Mall Depo. at 213:1–214:25; Mall Depo. Ex. 19.

[69]Doc. 40-1, Ex. A Jill Mall Depo. at 216:1–10; Mall Depo. Ex. 19.

[70]Doc. 51, Ex. D BNSF-MALL 000292–000293

[71]Doc. 40-3, Ex. C Amy Pool Depo. at 20:23–22:16.

[72]*Id.* at 20:15–22.

She also noted that "several folks" at BNSF had considered it for "many months and years."[73]

On September 26, 2016, Pool emailed all EAP team members announcing a general reorganization aligning the team under two larger regions—North and South.[74] Whitcomb became Manager II EAP, located in the Kansas Division for the South region; Shannon became Manager II EAP, located in the Powder Division for the North region.[75] Whitcomb worked out of the Kanas City office on a part-time basis until August 2017, when she relocated to Kansas City and became full-time. She had previously worked in Springfield, Missouri covering BNSF's Springfield Division, which no longer existed due to the reorganization.

BNSF's disability benefits administrator cleared Plaintiff to return to work on November 4, 2016 without restrictions.[76] On November 3, 2016, Pool advised Stanosheck in an email to make sure that Plaintiff did not go to the Kansas Division office on November 4 and to inform Plaintiff to wait for further instructions.[77] Plaintiff filed an EEOC Charge of Discrimination on November 15, 2016 citing discrimination based on sex, retaliation, disability, gender-plus child care/marital status, and FMLA.[78]

***Plaintiff's Post-Leave Return to Work Options***

On November 16, 2018, Plaintiff had a telephone conference with Stanosheck and Pool regarding her options for returning to work. In a November 18 follow-up email, Stanosheck summarized Plaintiff's three options that they had discussed on the call.[79] Plaintiff's first option

---

[73]*Id.*

[74]Doc. 51, Ex. D. BNSF-MALL 000087-88.

[75]*Id.*

[76]Doc. 40-1, Ex. A Jill Mall Depo. at 221:19–222:7; Mall Depo. Ex. 20.

[77]Doc. 51, Ex. D, BNSF-MALL 000314.

[78]Complaint, Doc. 1, Ex. A.

[79]Doc. 40-1, Ex. A Jill Mall Depo. Ex. 21.

was to accept the EAM I position in Billings, Montana.[80]  Because of her performance issues leading to the event in Amarillo and her performance issues during the Amarillo event, she would first be placed on a PIP and work out of Kansas City for sixty days during its completion. After successfully completing the PIP, Plaintiff would have an additional sixty days to move to Billings.[81]  Plaintiff had until November 28, 2016 to accept the EAM I position in Billings.[82] Plaintiff's second option was to accept a severance package by December 12, 2016.[83]  Plaintiff's third option was to look for another position at BNSF for a sixty-day period that expired on January 3, 2017.[84]

Prior to Plaintiff's medical leave, Whitcomb provided temporary EAP team member coverage in Montana, as the EAP position in Montana was handled on a rotating basis prior to BNSF moving the Kansas City EAM I position to Montana.  Plaintiff considered, but decided not to accept the Billings position.  Plaintiff did not locate another position at BNSF that she qualified for, and therefore did not apply for any other jobs with BNSF.  On January 9, 2017, having not received Plaintiff's response as to the three proposed options, Stanosheck sent Plaintiff a letter terminating her employment effective January 3, 2017.[85]

---

[80]*Id.*

[81]*Id.*

[82]*Id.*

[83]*Id.*

[84]*Id.*

[85]Doc. 40-1, Ex. A Jill Mall Depo. at 232:3–15.

### III.    Discussion

Plaintiff brings a total of six claims against BNSF—three arising under the ADA, one arising under the FMLA, one arising under Title VII, and one arising under Kansas law. The Court grants summary judgment in favor of BNSF on all Plaintiff's claims.

### A.    ADA Claims

Plaintiff asserts three ADA claims—discrimination based on disparate treatment, discrimination based on failure to provide reasonable accommodation, and hostile work environment.  The Court addresses each in turn.

### 1.    Discrimination Based on Disparate Treatment

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability."[86]  "A plaintiff may establish intentional discrimination either by [1] direct evidence or [2] by indirect proof under" the burden shifting framework in *McDonnell Douglas Corp v. Green*.[87]

### i.    Direct Proof of Discrimination

Plaintiff first argues she has presented direct evidence of disability discrimination. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."[88]  "Direct evidence requires 'proof of an existing policy which itself constitutes discrimination,'"[89] or "oral or written statements on the part of a defendant showing a

---

[86]*Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012) (quoting 42 U.S.C. § 12112(a)).

[87]*Mitchell v. City of Wichita, Kan.*, 140 F. App'x 767, 776 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04 (1973); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

[88]*Hall v. U.S. Dep't of Labor, Admin., Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (quoting *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)).

[89]*Id.* at 854–55 (quoting *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996)).

discriminatory motivation."[90]  Conversely, "[a] statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus does not constitute direct evidence."[91]  And similarly, personal opinions, even those "reflecting personal bias or prejudice, do not constitute direct evidence of discrimination . . . because the trier of fact must infer discriminatory intent from such statements."[92]

Plaintiff asserts various facts that she contends serve as direct evidence that BNSF discriminated against her.  However, none of her alleged facts constitute direct evidence of disability discrimination as they all require an inference of discriminatory intent.  Plaintiff alleges that difficulties with her supervisors and unwarranted criticisms of her work performance began during her June 2015 trip to Fort Worth, when she experienced and reported breathing difficulties associated with LAM.  Plaintiff next alleges that, three months after this, her supervisors prevented her from making a presentation because of her cough, and that her supervisor commented her cough was "scaring everyone."  She claims that after returning from continuous FMLA leave from October 2015 to January 2016 taken due to her disability, she experienced breathing problems at a conference, and that her supervisor did not explicitly excuse her attendance and inappropriately had her report her problems to the workers' compensation injury hotline.  Lastly, Plaintiff alleges that while she was on short-term disability, which was unrelated to her LAM, BNSF attempted to "paper" her file to support a performance-based termination, but that the company then shifted rationales to state that her position was "being eliminated" and "moved" to Montana.  Relying on speculation, she also believes that BNSF

---

[90] *Id.* at 855 (quoting *Kendrick*, 220 F.3d at 1225).

[91] *Id.* (quoting *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002)).

[92] *Id.* (citing *Shorter*, 188 F.3d at 1207).

changed the EAM I position in Kansas City to an EAP II position so that her supervisor could fill the position.

The Court finds that these facts do not prove the existence of discrimination without an inference or presumption, and thus do not constitute direct evidence of disability discrimination. As such, the Court considers these facts to be Plaintiff's circumstantial evidence used to create an inference of discrimination and establish Plaintiff's prima facie case of disability discrimination.

### ii. Indirect Proof of Discrimination

In the absence of direct evidence of discrimination, the Court uses the burden-shifting framework set forth in *McDonnell Douglas* to evaluate ADA discrimination claims.[93]  Under the burden-shifting framework, the plaintiff must first establish a prima facie case of discrimination.[94]  If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision.[95]  If the defendant meets this burden, the burden once again shifts back to the plaintiff, requiring the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext designed to mask discrimination.[96]  Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.[97]

---

[93]411 U.S. 792, 802 (1973).

[94]*Id.*

[95]*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).

[96]*Id.*

[97]*Id.*

### a.    Prima Facie Case

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case under the ADA by showing that: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability.[98]  Establishing a prima facie case is "not onerous,"[99] and "summary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position" with the aid of an accommodation.[100]

For purposes of summary judgment, BNSF does not dispute that Plaintiff can establish the first two elements of a prima facie case of disability discrimination—that she was disabled under the ADA and qualified to perform her essential job functions.[101]  The third element of a prima facie case of discrimination—that a plaintiff was discriminated against because of her disability—generally requires that a "plaintiff . . . show [s]he has suffered an 'adverse employment action because of the disability.'"[102]  The parties do not dispute that Plaintiff's termination constitutes an adverse employment action, and Plaintiff does not argue that other actions taken by BNSF constitute adverse employment actions.  BNSF, however, argues that Plaintiff's disability discrimination claim fails because she has not produced evidence that her alleged disability played a role in any legally cognizable adverse action taken against her.[103]

---

[98]*Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003)).

[99]*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quotation omitted).

[100]*Mason*, 357 F.3d at 1124.

[101]Doc. 41 at 19–20.

[102]*Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017) (quoting *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011)).

[103]*See id.*

Although Plaintiff offers sparse arguments as to the connection between her disability and an adverse employment action, the Court assumes for purposes of summary judgment that Plaintiff has established a prima facie case.

### b. Legitimate, Non-Discriminatory Reason and Pretext

Under *McDonnell Douglas*, the burden shifts to BNSF to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. BNSF terminated Plaintiff after Plaintiff did not accept any of the three options to return to work after she had been on leave and BNSF had eliminated the EAM I position in Kansas City. BNSF cites a system-wide reorganization as its reason for eliminating Plaintiff's position in Kansas City and creating an EAM I position Billings, Montana.[104] It offers uncontroverted evidence of this reorganization, including the explanation that it was based on a need for more significant EAP presence in Montana that had been discussed since at least early 2016. BNSF's reasoning for Plaintiff's termination, which on its face is legitimate and non-discriminatory, satisfies BNSF's "exceedingly light" burden.[105] The burden thus shifts to Plaintiff to show that BNSF's proffered reasons for terminating Plaintiff were pretextual.

Pretext can be inferred from evidence revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for termination.[106] Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

---

[104]*See Janczak v. Tulsa Winch, Inc.*, 621 F. App'x 528, 535 (10th Cir. 2015) ("Terminating an employee as part of a general reorganization of managerial responsibilities constitutes a non-retaliatory basis for termination . . . .") (citing *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (10th Cir. 2006)).

[105]*Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002) (quoting *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997)).

[106]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

> (1) With evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[107]

Plaintiff fails to demonstrate that BNSF's proffered reasons for her termination are pretextual because she relies on her own beliefs and speculation without articulating a dispute of material fact or any uncontroverted facts suggesting an inference of pretext.

Plaintiff first argues that BNSF's reasons for her termination are pretextual because of shifting rationales and inconsistencies in the reason for removing Plaintiff from her position. Plaintiff claims a material dispute exists as to the reliability of BNSF's rationale for its decision to eliminate her position in Kansas City and move it to Billings, Montana. Other than her conclusory assertion, however, Plaintiff, does not point to any evidence that calls into question deposition testimony articulating BNSF's stated reason for moving the position. The uncontroverted facts indicate that BNSF eliminated the Kansas City EAM I position and transferred it to Billings as part of reorganization and a need for an EAM I position in Montana. The record shows this plan had been discussed since early 2016, well before BNSF presented Plaintiff with employment options when she returned from leave. Therefore, Plaintiff's conjecture that the reason for moving the position was pretextual and used to terminate her based on her disability is insufficient to create an inference of discriminatory intent.

Plaintiff further contends that the record indicates an excessive documentation of Plaintiff's activities, which demonstrates an attempt to "paper" her file. While evidence of

---

[107]*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)) (quotations and citations omitted).

"papering" a file can create an inference of pretext,[108] the record does not support Plaintiff's

contention that her activities were excessively documented prior to her termination or that they

became more documented after she experienced issues stemming from her disability. The record

indicates that Plaintiff had predominately positive mid-year and yearly evaluations, receiving

overall ratings of "on target." While Plaintiff received both a PAP and an updated PAP after the

events at NEO where she experienced breathing difficulties, Whitcomb explained that a PAP was

an informal process she utilized to target room for growth with employees under her supervision.

The record also shows that BNSF had a document, dated September 12, 2016, entitled "timeline"

detailing Plaintiff's performance since her hire date, and that on September 13, 2016, Pool

authored a document compiling notes on Plaintiff's performance during the Amarillo event. It is

undisputed that Pool and others kept notes as incidents occurred, that Pool pulled them together

to create timelines, and that the "Panhandle Event Timeline" was the result of various

contributions over an extended period and was possibly saved as a new document on September

13, 2016. Additionally, the record does not show, nor does BNSF contend, that BNSF

terminated Plaintiff for issues relating to her performance. Thus, any alleged "papering" is

purely speculative and does not support an inference of pretext in this case.

Throughout her Response, Plaintiff recites various legal standards regarding the Court's

role at summary judgment. Nothing in these facts or record gives rise to an inference that

BNSF's stated reason for terminating Plaintiff is a pretext for discrimination based on Plaintiff's

disability. Plaintiff has not established a genuine dispute of material fact or pointed to

uncontroverted facts from which a reasonable jury could conclude the reasons for Plaintiff's

---

[108]*See Marshall v. Gen. Motors LLC*, No. 16-cv-2651-JWL, 2017 WL 5465270, at *8 (D. Kan. Nov. 14, 2014) ("A reasonable jury could conclude, based on the absence of [performance related] notations prior to plaintiff's complaint, that [plaintiff's supervisor] was 'papering' plaintiff's file in an effort to justify removing him from the group leader position in light of his complaint about her remark.").

termination are pretextual.  Accordingly, BNSF is entitled to summary judgment on Plaintiff's disparate treatment claim.

### 2. Discrimination Based on Failure to Provide Reasonable Accommodation

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[109]  Although the Pretrial Order includes a failure to accommodate claim,[110] BNSF argues that Plaintiff forfeited any failure to accommodate claim because she conceded in her deposition testimony that she did not make any requests for accommodation or inform BNSF she needed aspects of her job changed.[111]  In her Response, Plaintiff devotes a single sentence to BNSF's alleged failure to accommodate that refers to her experience during a multi-day conference in late-April 2016 at the Argosy Casino.  She states that after reporting to her supervisors that she was unable to attend the conference due to smoke inhalation inside the casino, that "[i]nstead of accommodating [Plaintiff's] disability and excusing her from the remainder of the conference, Plaintiff's supervisor inappropriately refers her to the worker's compensation injury hotline."[112]

The Tenth Circuit has held that a plaintiff must show a causal connection between an employer's failure to accommodate and an adverse employment action.[113]  Assuming but not

---

[109]42 U.S.C. § 12112(b)(5)(A).

[110]Doc. 37 at 11.

[111]Doc. 41 at 23; Doc. 40-1, Ex. A Jill Mall Depo. at 138.

[112]Doc. 41 at 20.

[113]*Exby-Stolley v. Bd. Of Cty. Comm'rs, Weld Cty, Col.*, No. No. 16-1412, 2018 WL 4926197, at *4–13 (10th Cir. Oct. 11, 2018) (concluding that "an adverse employment action is an element of a failure-to-accommodate claim").

deciding that Plaintiff's email constitutes a reasonable request for accommodation that BNSF denied, Plaintiff must also show a causal connection between BNSF's failure to accommodate and an adverse employment action.[114] Here, the uncontroverted facts do not support an inference that BNSF's alleged failure to accommodate Plaintiff resulted in any adverse action taken against Plaintiff, namely her termination that occurred nearly seven months later. Therefore, as a matter of law, Plaintiff has not established a prima facie case to support her discrimination theory based on BNSF's failure to provide a reasonable accommodation, and the Court grants summary judgment for BNSF on this claim.

### 3. Disability Harassment

The Tenth Circuit has held that hostile work environment claims are actionable under the ADA.[115] To succeed on a hostile work environment claim, a plaintiff must show that "(1) she is a qualified individual with a disability; (2) the conduct in question was unwelcome; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) the facts provide a basis for imputing liability to the employer."[116] As discussed above, the parties do not dispute that Plaintiff suffers from a disability as defined by the ADA. With respect to Plaintiff's claim of disability harassment, the parties' arguments revolve around the severity of alleged harassment and whether it created an abusive working environment. Viewing the facts in a light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Plaintiff's allegations of harassment reach the

---

[114]*See id.*

[115]*Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1155 (10th Cir. 2004).

[116]*Monaco v. Quest Diagnostics, Inc.*, No. 08-2500-KHV, 2010 WL 3843622, at *11 (D. Kan. Sept. 24, 2010) (citing *Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1156–58 (10th Cir. 2004)); *Mendia v. Hawker Beechcraft Corp.*, No. 06-1212-JTM, 2008 WL 216914, at 10 (D. Kan. Jan. 17, 2008); *Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1196, 1214 (D. Kan. 2007).

level of severity and pervasiveness required to create a hostile work environment as a matter of law.

The determination of whether a hostile work environment existed "is not, and by its nature cannot be, a mathematically precise test."[117] Instead, the court must consider the totality of the circumstances, including the "frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[118] "Simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment, as they do not change the "terms and conditions of employment."[119] In her Response to BNSF's summary judgment motion, Plaintiff does not point to specific instances of conduct that created a hostile work environment—rather, she makes a blanket statement that issues with her supervisors arose after symptoms of her disability became an issue, and that work performance criticisms and removal from her position followed.[120]

Plaintiff relies on *Flowers v. Southern Regional Physician Services Inc.*[121] to support her hostile work environment claims. In *Flowers*, a jury found that the plaintiff was subjected to unwelcome harassment based on her HIV status, and that the harassment was so severe and pervasive that it unreasonably interfered with her job performance.[122] In *Flowers*, the plaintiff's work environment changed and she was ultimately discharged after she disclosed she was HIV

---

[117]*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957–58 (10th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).

[118]*Id.* (citing *Harris*, 510 U.S. at 23).

[119]*Faragher v. City of Boca Raton*, 524 U.S. 775, 776 (1998).

[120]Doc. 45 at 24.

[121]247 F.3d 229 (5th Cir. 2001).

[122]*Id.* at 236–37.

positive.[123]  Following the plaintiff's diagnosis, members of leadership were rude and critical of her performance, refused to shake her hand, subjected her to four random drug tests in a single week, called her a "bitch," said she was "full of crap," and physically reached into her pocket to remove a recording device during her meeting.[124]

The conduct creating a hostile work environment in *Flowers*, however, was much more egregious than in the instant case.  Indeed, Plaintiff admits that her allegations of offensive comments are "fewer and farther between" because her supervisors were in different states.[125]  In contrast to the plaintiff in *Flowers*, Plaintiff recites sparse, isolated instances of alleged harassment that a reasonable jury could not find to be threatening or humiliating.  Plaintiff contends that she was verbally counseled for leaving work early for personal health issues, asked not to present at a team meeting because of a cough, and told by a supervisor to "just keep [her] health in check and things will be okay" during a regularly scheduled meeting to discuss work matters.  Even taking these occurrences in a light most favorable to Plaintiff and inferring that they were based on her disability, these instances are not sufficiently severe or pervasive to create an abusive environment.

Similarly, Plaintiff's supervisors' criticism of her work performance and behavior is insufficient to create an inference of a hostile work environment.  Plaintiff indicates that following the events and her performance in Amarillo, her supervisors criticized her work performance and behavior.  However, "[b]ecause the severity of conduct involving criticism of an employee's work performance often is colored by the eye of the beholder, courts recognize that 'even loud expressions of disapproval' fall within 'the kind of normal strains that can occur

---

[123]*Id.* at 236.

[124]*Id.* at 236–37.

[125]Doc. 45 at 24.

in any office setting.'"[126]  While Plaintiff alleges she was upset during one of phone calls with her supervisors and that one of her supervisors hung up on her during one of their phone conversations, Plaintiff fails to identify how her supervisors' comments or actions were outside the normal strains that occur in employment situations.[127]  While it is undisputed that Plaintiff's supervisors criticized her during her time in Amarillo, Plaintiff neither identifies facts that indicate the criticisms stemmed from a disability she suffered, nor characterizes the criticism as occurring in an unprofessional or hostile manner.  Instead, the criticism included her supervisors' expectations and explanations of their concerns.  Thus, this criticism does not meet the level of severity required for a hostile work environment claim.

Therefore, the uncontroverted facts indicate that while Plaintiff may have suffered occasional instances of offensive remarks, under the totality of the circumstance, a reasonable jury could not find Plaintiff's allegations of harassment sufficiently severe or pervasive to create an abusive working environment.  The Court grants summary judgment on Plaintiff's disability harassment claim in favor of BNSF.

### B.        FMLA Retaliation

Plaintiff brings a FMLA retaliation claim under 29 U.S.C. § 2615(a)(2), asserting that BNSF retaliated against her for exercising her rights under the FMLA by terminating her employment.  The FMLA guarantees eligible employees substantive rights of up to twelve weeks of unpaid leave for serious health conditions and reinstatement to their former position or an

---

[126]*Peru v. T-Mobile USA, Inc.*, 897 F. Supp. 2d 1078, 1094 (D. Colo. 2012) (quoting *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 7 (D.D.C. 2012) (loud expressions of disapproval), citing *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) (normal strains)).

[127]*See Peru*, 897 F. Supp. 2d at 1094. (granting summary judgment on a hostile work environment claim, where among other things, there was a single instance of a supervisor screaming at an employee).

equivalent position upon return from that leave,[128] and makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."[129]

As Plaintiff acknowledges, her FMLA retaliation claim is analyzed under the *McDonnell Douglas* framework.[130]  Plaintiff bears the initial burden of establishing a prima facie case of FMLA retaliation.  To do so, plaintiff must demonstrate that: (1) she availed herself of a protected right under the FMLA; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there is a causal connection between the protected activity and the adverse action.[131]  Once plaintiff establishes a prima facie case of FMLA retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.[132]  Once the defendant satisfies this burden of production, the burden then shifts back to the plaintiff to present evidence that the defendant's proffered reason is pretextual.[133]

Instead of establishing a prima facie claim of retaliation, however, Plaintiff asserts that she had the right to be restored to her original position or its equivalent upon return from leave, and that her position was not available prior to the end of twelve weeks.[134]  Plaintiff argues that BNSF's "option" to allow her to return to work placed on a PIP in a position over 1,000 miles

---

[128]*See* 29 U.S.C. §§ 2612(a)(1), 2614(a).

[129]*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir. 2011) (citing 29 U.S.C. § 2615(a)(2)).

[130]*Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 886 (D. Kan. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

[131]*See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006); *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 n.2 (10th Cir. 2006) (discussing and quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[132]*Metzler*, 464 F.3d at 1170.

[133]*See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323–25 (10th Cir. 1997).

[134]Doc. 45 at 24–25.

away by no means constitutes restoring her to an equivalent position, and thus genuine factual issues exist as to whether she suffered FMLA retaliation. Plaintiff's argument, however, conflates a FMLA retaliation claim under § 2615(a)(2) with a FMLA interference claim under § 2615(a)(1).[135] "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent."[136] In response to Plaintiff's argument, BNSF notes that Plaintiff's leave extended past the twelve-week maximum and therefore, when she received clearance to return to work, her right to reinstatement had expired.[137] The Pretrial Order entered in this case, however, only asserts a claim of FMLA retaliation.[138] The Pretrial Order "controls the course of the action unless the court modifies it."[139] "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[140] Because Plaintiff does not assert a FMLA interference claim in the Pretrial Order, the Court finds the FMLA interference claim has been waived.

Even assuming for the purposes of summary judgment that Plaintiff establishes a prima facie case of FMLA retaliation, however, the Court finds no genuine issue of material fact on the issues of BNSF's legitimate, non-discriminatory reason for Plaintiff's termination and pretext. Upon learning that Plaintiff received clearance to return to work more than twelve weeks after she took FMLA leave, BNSF provided Plaintiff three options to return work. Plaintiff did not

---

[135]*See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) (discussing two types of FMLA claims under 29 U.S.C. § 2615(a)(1) and (2)).

[136]*Id.* (citation omitted).

[137]*See Degraw v. Exide Techs.*, 744 F. Supp. 2d 1199, 1215–16 (D. Kan. 2010) (citing various cases and finding "that defendant did not interfere with plaintiff's right to reinstatement under FMLA because plaintiff's FMLA right to reinstatement expired when plaintiff's FMLA-authorized leave expired").

[138]Doc. 37 at 12.

[139]Fed. R. Civ. P. 16(d).

[140]*Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

accept any of the three options, and upon expiration of the last option, BNSF terminated

Plaintiff.  As previously determined, the company restructuring and Plaintiff's failure to accept

one of BNSF's options to return to work constitute legitimate, non-discriminatory reasons for

Plaintiff's termination.  The burden thus shifts to Plaintiff to show that BNSF's proffered reasons

for terminating her were pretext.

Plaintiff, however, does not establish a genuine dispute of material fact from which a

reasonable jury could infer BNSF's legitimate, non-discriminatory reasons for terminating

Plaintiff were pretextual.  As previously discussed with respect to Plaintiff's ADA discrimination

claim, the record does not indicate that BNSF terminated Plaintiff for any reason other than her

not accepting one her three options to return to work that existed due to the company's

restructuring.  Plaintiff takes issue with one of her options for returning to BNSF after leave

requiring that she be on a PIP and take a position over 1,000 miles away.  However, BNSF did

not have a legal obligation to reinstate Plaintiff to her former position as it is undisputed that

Plaintiff's FMLA leave extended past the twelve-week statutory entitlement because her leave

began on July 6, 2016 and she did not receive clearance to return to work until November 4,

2016. [141]  As BNSF notes, Plaintiff's theory requires her to show that BNSF relocated the EAM I

position because she took FMLA leave, which has no support in the record beyond mere

conjecture and belief.

Here, Plaintiff does not successfully cite any evidence that suggests a retaliatory motive.

In her Response, Plaintiff does not make any additional arguments relating to pretext for her

FMLA retaliation claim.  The Court thus considers her pretext arguments relating to her ADA

discrimination, and as previously discussed, the Court finds that Plaintiff does not raise a triable

---

[141] *See id.*

issue of pretext. Moreover, the record does not support an inference that BNSF moved the EAM I position to Billings, Montana because Plaintiff took FMLA leave or that Plaintiff would have retained her EAM I position if she had not taken FMLA leave. Instead, the undisputed facts show that BNSF eliminated Plaintiff's EAM I position in Kansas City and moved it to Billings as part of company restructuring and a greater need for the EAM I position in Montana. Because Plaintiff has failed to raise a genuine issue of material fact as to whether BNSF's stated reason for terminating Plaintiff is pretext for retaliation, the Court grants BNSF's Motion for Summary Judgment on Plaintiff's FMLA retaliation claim.

### C. Title VII Gender-Plus Discrimination and Worker's Compensation

Finally, Plaintiff claims that BNSF discriminated against her in violation of Title VII based on her status as a female parent of a minor child requiring care,[142] and that BNSF retaliated against her in violation of Kansas public policy because she suffered an injury for which she could have asserted a claim under the Kanas Workers Compensation Act.[143] In her Response to BNSF's motion for summary judgment, Plaintiff expressly abandoned her Title VII claim of "gender-plus" discrimination and her Kansas state law claim of retaliatory discharge.[144] Therefore, the Court grants summary judgment for BNSF on these claims.

**IT IS THEREFORE ORDERED BY THE COURT** that BNSF's Motion for Summary Judgment (Doc. 40) is **granted**. Plaintiff's case is dismissed in its entirety.

---

[142]Doc. 37 at 11.

[143]K.S.A. 44-501 *et seq.*; Doc. 37 at 12.

[144]Doc. 45 at 25.

**IT IS SO ORDERED.**

Dated: November 14, 2018

                                                       S/ Julie A. Robinson
                                                       JULIE A. ROBINSON
                                                       CHIEF UNITED STATES DISTRICT JUDGE